## In the

## United States Court of Appeals

### For the Seventh Circuit

Nos. 09-2682 & 09-2470

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAMONTE HALL AND KARINDER GORDON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 386—**David H. Coar**, *Judge.*

ARGUED APRIL 22, 2010—DECIDED JUNE 17, 2010

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In the spring of 2008, appellant Shamonte Hall believed he had stumbled upon a great criminal opportunity. A disgruntled drug courier asked if he would help him rob a drug stash house under armed guard. For the help, the courier told him, Hall and his crew would get a share of the several kilograms of cocaine hidden in the stash house, which they could then sell for a profit.

It was too good to be true. The drug courier was actually an undercover agent, the stash house was a fiction, there were no drugs to steal, and Hall and his crew were arrested shortly before they could carry through with the plan. Hall and appellant Karinder Gordon were charged with various drug and firearm offenses. At the end of a jury trial, Hall was convicted on all charges, and Gordon was convicted of being a felon in possession of a firearm. In these consolidated appeals, Hall challenges his convictions, arguing that the district court erred by refusing to instruct the jury on the affirmative defense of entrapment. Gordon challenges only his sentence. We affirm in all respects.

*The Facts*

As part of an undercover investigation targeting individuals involved in armed home invasions, a confidential informant introduced Hall to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives. The purpose of this introduction was for the agent to present Hall an opportunity to commit an armed robbery. At their first meeting, the agent told Hall that he wanted to rob a group of drug dealers he worked for in the North Chicago area. The agent claimed to be angry with those dealers because the last time he had made deliveries for them, he had asked for extra money to pay for surgery for his son. The dealers had refused to give him that money, so the story went, which angered him so much that he decided to steal the dealers' cocaine. The dealers, the agent explained, stored about 10 to 12 kilograms of cocaine under armed guard

in the garage of a home. After Hall agreed to participate in the robbery, the agent told Hall to arrange for his crew to meet with the agent to go over their plan.[1] When the agent met with Hall again, however, none of Hall's crew showed up. The agent asked about the crew's absence, and Hall claimed that they knew "what's up." Hall and the agent then went over the robbery plan. Before the meeting concluded, Hall explained that he and his crew were ready whenever the agent needed them.

On the afternoon of the planned robbery, the undercover agent, Hall, Rodney Ray, and appellant Karinder Gordon retrieved two guns from Gordon's apartment and drove to Foss Park in North Chicago to wait for a telephone call from the supposed drug dealers saying where the drugs were stored. When they arrived at Foss Park, the agent parked his truck, pretended to get a telephone call, and walked away. He then gave a signal to a law enforcement team that arrested Hall, Gordon, and Ray.

Following their arrest, the three men were charged with conspiracy to possess cocaine with intent to distribute, attempted possession of cocaine with intent to distribute, and possession of a firearm in relation to a drug trafficking crime. Hall and Gordon were also charged with being felons in possession of a firearm.

Hall, Gordon, and Ray were tried jointly. The government's primary witness was the undercover agent, who

---

[1] The agent made audio recordings of all of his meetings with Hall.

described in detail the undercover sting operation. The defendants presented no evidence in their defense. The jury found Hall guilty of attempted possession of cocaine with intent to distribute, possession of a weapon in furtherance of a drug trafficking crime, and being a felon in possession of a firearm. The jury found Gordon guilty only of being a felon in possession of a firearm. Ray was acquitted of all charges.

One key issue was whether Hall could present an entrapment defense. Before trial, the government filed a motion *in limine* to preclude the presentation of any evidence or argument regarding entrapment. The district court granted the motion, but Hall nevertheless requested that the jury be instructed regarding entrapment. The court denied that request. In a post-trial motion, Hall moved for a judgment of acquittal and a new trial, arguing in part that the court had erred by barring any evidence of entrapment and by denying his request to instruct the jury on the entrapment defense. The district court denied this motion and sentenced Hall to 175 months in prison. Gordon was sentenced to the statutory maximum prison term of 120 months.

*Analysis*

I. *Defendant Hall—Entrapment Instruction*

Hall argues that the district court erred by refusing to instruct the jury on the entrapment defense. A defendant is entitled to a jury instruction on his theory of defense

if: (1) the requested instruction is a correct statement of the law; (2) the evidence supports the theory of defense at issue; (3) the defense is not part of the government's charge; and (4) the failure to give the instruction would deprive the defendant of a fair trial. *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007), citing *United States v. Al-Shahin*, 474 F.3d 941, 947 (7th Cir. 2007). We review de novo a district court's decision not to give a proffered instruction. *Millet*, 510 F.3d at 675.

The decisive issue here is whether the evidence supported the existence of the entrapment defense. To raise an entrapment defense, a defendant must make a showing of both elements of that defense: (1) that he was induced by a government actor to commit the crime at issue; and (2) that he was not predisposed to commit that crime. *Id.*, citing *United States v. Haddad*, 462 F.3d 783, 789-90 (7th Cir. 2006). If the evidence shows the defendant's predisposition, the entrapment defense should be rejected without any inquiry into government inducement. *Millet*, 510 F.3d at 675, citing *United States v. Bek*, 493 F.3d 790, 800 (7th Cir. 2007).

When analyzing a defendant's predisposition to commit a crime, we consider:

> (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999). No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense. *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983), quoting *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir. 1977).

The evidence for the defense need not be compelling, but there must be some evidence to support it. The defendant in a criminal case is entitled to have the jury consider any defense theory that is supported by the law and that has some reasonable foundation in the evidence. *United States v. Briscoe*, 896 F.2d 1476, 1512 (7th Cir. 1990), citing *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); see generally *United States v. Mathews*, 485 U.S. 58, 62 (1988) (defendant is entitled to entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment); *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991) (same).

The evidence presented in this trial showed beyond dispute that Hall was predisposed to commit the crimes of which he was convicted. In regard to Hall's character, we note that he pled guilty to armed robbery in 2003. As to the second and third factors of the predisposition analysis, although the government (rather than some other party) initially suggested the criminal activity, Hall was certainly willing to participate in the criminal enterprise for a profit. The drugs were to be split evenly among the agent, Hall, and Hall's crew, and Hall even mentioned that the profits from the drug sales would be enough for them all to take vacations.

Regarding the nature of the government inducement, we disagree with Hall's contention that the government preyed on his pity for the undercover agent's fictitious sick son. The agent claimed to have a sick son who had previously needed surgery, but he never said that he needed money to pay for that surgery. Rather, the agent made clear that he wanted to rob the drug dealers because, by failing to give him extra money when he was trying to pay for his son's surgery, the dealers had disrespected him and "pissed me off." In any event, we do not accept the theory that Hall acted out of compassion. It is not as if Hall ever offered to share his cut of the expected profits to help pay for the fictional surgery. If Hall had been acting out of anything other than greed, he might have offered to give the agent a larger share of the profits rather than dividing the drugs evenly among the entire crew. A modern-day Robin Hood he was not. The agent merely provided a plausible cover story to explain his own motives. Hall was not subjected to any unusual or unfair persuasion.

We also disagree with Hall's contention that the sizeable potential profit from the proposed robbery of cocaine was an extraordinary inducement. We rejected a similar argument in *Millet*, which also involved a planned heist of illegal drugs. In that case, the defendant stood to make several hundred thousand dollars in profits from his planned robbery of a large quantity of drugs. We concluded that the potential profits were "in stark contrast to the classic example of extraordinary inducement," in which extraordinary profits are promised for the commission of a minor crime. *Millet*, 510

F.3d at 677, quoting *Evans*, 924 F.2d at 717. Here, as in *Millet* and *Evans*, Hall was offered "an opportunity to enter the drug trade . . . on the usual terms," through the acquisition of "a source of supply, in whole-sale quantities." See *Evans*, 924 F.2d at 717 (affirming refusal to give entrapment instruction). In other words, Hall was presented with the same temptation faced by any person contemplating the robbery of a drug stash house: the chance to acquire quickly a large amount of drugs that could be resold for a big profit. It only further undercuts Hall's "extraordinary inducement" argument that he planned to split the stolen cocaine evenly four ways (with his crew and the undercover agent) and planned to sell his own share of the drugs not for an extraordinary price or even an ordinary price, but for what he perceived to be a below-market price.

We find nothing in the record to support the most important factor in our predisposition analysis: whether Hall was reluctant to participate in the proposed heist. When the agent first approached Hall to see if he was interested in the proposed robbery, Hall insinuated that he and his crew would "go in there [and] kill every-body" so that they would not have to worry about "reper-cussions." Asked if he would commit the robbery, Hall responded not with hesitance or reluctance but with an unambiguous "Hell yeah." And when asked if the crew would have trouble going in "blastin'," Hall responded: "No, if you got [the] right price, you can get a motherfucker knocked off." As if those statements were not enough, Hall showed his lack of reluctance when

he said that "when it's ready to go down there ain't gonna be no hesitation about it." Hall's own recorded words made clear that he was ready to commit the robbery even if it meant that he had to take a few lives in the process.

In an attempt to support his reluctance argument, Hall notes his slow responses to the agent's telephone calls, his late arrivals for meetings with the agent, and his crew's general state of unpreparedness on the day of the planned heist. Our review of the record, however, indicates that Hall was not so much a reluctant robber as an incompetent one. When asked about his crew's failure to show up for their earlier meeting, Hall reassured the agent that he and his crew "definitely were in." And Hall never indicated that he wanted to back out, even when he had trouble finding Gordon (who had the crew's guns) on the day of the planned robbery. Rather, Hall guided the agent to a number of different locations in an attempt to find Gordon, and after doing so, led them back to Gordon's apartment to pick up the weapons. Hall's persistence in the face of difficulties shows his lack of reluctance; a person who was truly reluctant to commit a crime would take advantage of a ready excuse to withdraw from a criminal enterprise. See *United States v. Theodosopoulos*, 48 F.3d 1438, 1447 (7th Cir. 1995) (noting that defendant's failure to abandon a criminal transaction "when it encountered trouble spots" is evidence of a lack of reluctance). These events do not show that Hall actually had second thoughts about the planned robbery, but even if he did, such "second thoughts following initial enthusiasm

do not establish entrapment." *Evans*, 924 F.2d at 716 (affirming refusal to give entrapment instruction), citing *United States v. Marren*, 890 F.2d 924, 931 (7th Cir. 1989) (same).

*Jacobson v. United States*, 503 U.S. 540 (1992), as we interpreted that decision in *United States v. Hollingsworth*, 27 F.3d 1196, 1199 (7th Cir. 1994) (*en banc*), does not establish a lack of predisposition as a matter of law. Jacobson was a farmer who had ordered child pornography only "after the Government had devoted 2 1/2 years to convincing him that he had or should have the right to" do so. 503 U.S. at 553. In concluding that Jacobson had been entrapped, the Supreme Court observed that he was "an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Id.* at 553-54. In *Hollingsworth*, we explained that *Jacobson* did not (as Hall seems to insist) add an "ability" element to the entrapment formulation. 27 F.3d at 1199. Rather, *Jacobson* recognized only that, to be predisposed to commit a crime, one "must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." *Id.* at 1200. Hall might or might not have had all the criminal skills and organizational competence needed to carry off a successful robbery of cocaine, but he certainly had at least two acquaintances willing to help him when he was asked to rob a drug stash house. As *Hollingsworth* made clear, that fact supports a conclusion that Hall was predisposed in a "positional" sense to commit this crime. *Id.*

The evidence presented at trial would not have allowed a reasonable jury to find that Hall was reluctant to participate in the planned robbery. He jumped at the chance, and no extraordinary profits were used to induce his participation. The lack of evidence supporting an entrapment defense is not surprising. Hall neither testified in his own defense nor presented any evidence of his lack of predisposition. He relies on only the government's evidence to support the defense.[2] It would be unusual for the government's case-in-chief to reveal a defendant's lack of predisposition. See *United States v. Demma*, 523 F.2d 981, 985 (9th Cir. 1975) (*en banc*). Except in unusual circumstances that we have trouble imagining, a defendant would seem to need to present some affirmative evidence of entrapment. See *United States v. Mathews*, 485 U.S. 58, 65 (1988), quoting *Demma*, 523 F.2d at 985. In this case, with only the testimony and evidence presented in the government's case, there simply is no evidence that Hall was not predisposed to join in the proposed robbery plan. The district court did not err by refusing to give a jury instruction on entrapment.

II. *Defendant Gordon—Sentencing Issues*

When reviewing the district court's sentencing decisions, we engage in a two-step process of review, first

---

[2] Hall was unable to present any evidence on entrapment because of the district court's pretrial ruling on the government's motion *in limine*. He explicitly waived any challenge to that ruling on appeal.

determining whether the district court committed any procedural error, and second examining the sentence itself for substantive reasonableness. *United States v. Omole*, 523 F.3d 691, 697-98 (7th Cir. 2008). We review for procedural error de novo, while our reasonableness review is only for an abuse of discretion. *United States v. Hurt*, 574 F.3d 439, 442 (7th Cir. 2009).

At Gordon's sentencing hearing, the parties agreed that the total Sentencing Guidelines offense level was 32, with a criminal history category of VI, giving Gordon an advisory Guidelines sentencing range of 210 to 262 months in prison. The statutory maximum sentence for Gordon's offense of conviction was only 120 months. Because the calculated range was greater than the statutorily-authorized maximum sentence, the Guidelines range for purposes of our review is not a range but simply 120 months. U.S.S.G. § 5G1.1. Gordon's sentence of 120 months is consistent with the Guidelines and is presumed reasonable on appeal. *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009), citing *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008).

Gordon argues that the district court committed procedural error by failing to take into account the 18 U.S.C. § 3553(a) factors when imposing its sentence. He also challenges the reasonableness of his sentence by arguing that the court should have imposed a lower sentence in light of his absent father, his violent behavior in high school, his regular alcohol use, and marijuana's effect on his judgment the day he was arrested. Gordon also objects to the district court's statement that he had

already received a "break" because the statutory maximum sentence was significantly lower than the low end of the Guidelines range. He claims that this statement showed that the district court focused only on the evidence presented against him at trial, rather than the not-guilty verdicts on all but the felon-in-possession charge against him.

Gordon's procedural error argument is without merit. The district court clearly took the section 3553(a) factors into account, noting the seriousness of the offense conduct and the need to protect the community from Gordon, who had a history of violent crime and had most recently been found with a loaded 12-gauge shotgun in his car. The judge said he believed that Gordon would not receive any intervention in prison that might prevent him from resuming his pattern of violence upon his release, and the judge determined that a 120-month sentence was necessary. The transcript shows that Judge Coar gave the case the thoughtful consideration that is contemplated by section 3553(a).

Furthermore, to the extent that the court based its sentence on its conclusion that Gordon was a "willing participant in this scheme to commit this home invasion . . . to rob these drug dealers," section 3553(a)(1) explicitly requires a sentencing court to consider "the nature and circumstances of the offense." Gordon was not arrested for possession of a weapon in a closet in his home or for possession of a weapon while on a hunting trip. He was arrested on his way to commit a violent crime. That fact was critical as the court deter-

mined an appropriate sentence. Although Gordon was acquitted on the other counts of the indictment, a district court applies a lesser preponderance-of-the-evidence standard when making findings of fact for sentencing purposes. *United States v. Johnson*, 342 F.3d 731, 735 (7th Cir. 2003), quoting *United States v. Porter*, 23 F.3d 1274, 1277 (7th Cir. 1994). We respect the jury's determination that the evidence did not show Gordon's guilt of the other offenses beyond a reasonable doubt, but we agree with the district court that the evidence established Gordon's involvement in the robbery scheme by a preponderance of the evidence. The district court did not err by considering the evidence introduced at trial when deciding Gordon's sentence for the unlawful possession of a firearm.

Gordon complains that his sentence was unreasonable because the district court failed to take into account his arguments for a reduced sentence. A sentencing judge may reject without discussion generic or stock arguments that defendants make as a matter of course at sentencing. *United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2009), citing *United States v. Martinez*, 520 F.3d 749, 753 (7th Cir. 2008). Gordon's arguments that he never knew his father and had a history of youthful misbehavior are examples of stock arguments that unfortunately do not meaningfully distinguish Gordon from so many other criminal defendants. The same could be said of Gordon's arguments concerning his alcohol and marijuana use if those arguments had any force toward mitigation, which they do not.

The district court committed no error when it considered and rejected Gordon's arguments about his difficult childhood and when it passed over his remaining arguments in silence. Lacking any other bases on which to challenge his sentence, Gordon cannot show that his is that "rare case" in which a within-Guidelines sentence should be considered unreasonable. See *United States v. Myktiuk*, 415 F.3d 606, 608 (7th Cir. 2005).

Hall's convictions and Gordon's sentence are AFFIRMED.