In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-3335

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RALPH GARCIA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cr-00109-1 — **Robert M. Dow, Jr.**, *Judge.*

_____

ARGUED APRIL 7, 2022 — DECIDED JUNE 23, 2022

_____

Before RIPPLE, KANNE,[1] and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* After engaging in multiple sales of
methamphetamine and of a weapon to a confidential

---

[1] Circuit Judge Michael Kanne died on June 16, 2022, and did not partici-
pate in the decision of this case, which is being resolved by a quorum of
the panel under 28 U.S.C. § 46(d).

informant, Ralph Garcia was charged with three counts of distributing fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); two counts of distributing five grams or more of methamphetamine, also in violation of 21 U.S.C. § 841(a)(1); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Mr. Garcia consented to a bench trial, during which the court permitted him to introduce evidence of entrapment. The district court, as the trier of fact, ultimately concluded that Mr. Garcia was not entrapped and found him guilty on all counts.

The probation office then prepared a presentence report ("PSR") and determined Mr. Garcia's offense level to be 35, with a resulting Guidelines range of 292 to 365 months. His offense level was based in part on a 1993 conviction for aggravated battery with a firearm. The PSR also noted that Mr. Garcia was subject to a fifteen-year mandatory minimum sentence on the firearm count pursuant to 18 U.S.C. § 924(e) because he had three previous convictions for violent felonies. Mr. Garcia did not object to the calculation of his offense level (or the resultant Guidelines range), nor did he contend that the mandatory minimum sentence did not apply.

On appeal, Mr. Garcia raises three claims of error. First, he maintains that the Government did not meet its burden of showing, beyond a reasonable doubt, that he was not entrapped. The record, however, contains ample evidence that Mr. Garcia was not induced to commit the weapon and drug transactions and was otherwise predisposed to engage in those transactions. Consequently, there is no basis on which to disturb the district court's conclusion that Mr. Garcia was not entrapped.

Second, Mr. Garcia maintains that the district court committed plain error in subjecting him to a mandatory minimum sentence because the PSR did not identify the Illinois statute attendant to Mr. Garcia's conviction for aggravated battery with a firearm. There is no merit to this contention. The PSR, supported by documentation, identifies Mr. Garcia's crime of conviction as aggravated battery with a firearm under Illinois law, which is a crime a violence.

Third, Mr. Garcia contends that the district court committed plain error in using his 1993 aggravated battery with a firearm conviction when calculating his offense level. The Government agrees, as do we. When determining Mr. Garcia's offense level for his firearm conviction, the district court should not have increased the offense level based on prior convictions for which no criminal history points were awarded. Because Mr. Garcia's offense level rests in part on that conviction, and because this offense level increased Mr. Garcia's Guidelines range, we vacate his sentence and remand for resentencing based on a corrected offense-level calculation.

## I

### A. Background

In 2014, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") began investigating the Joliet, Illinois faction of the Latin Kings, of which Mr. Garcia was a leading member. In November of that year, a confidential informant ("CI") told one of the investigating agents, Special Agent Andrew Karceski, that Mr. Garcia was selling drugs. The CI, also a member of the Latin Kings, had been acquainted with Mr. Garcia since 2012. The ATF arranged for the CI to make

contact with, and purchase drugs and a firearm from, Mr. Garcia. Indeed, from November 2014 to March 2015, Mr. Garcia sold methamphetamine to the CI on five occasions, and on one of those occasions also sold the CI a firearm. All of the meetings between the CI and Mr. Garcia were recorded and closely monitored.

The first recorded conversation between the CI and Mr. Garcia took place on November 15, 2014. During that conversation, Mr. Garcia discussed his access to different types of drugs, including China white heroin, black tar heroin, cocaine, and crystal methamphetamine; he also displayed knowledge of the wholesale and street prices of those drugs. The CI expressed his interest in purchasing drugs for resale, and Mr. Garcia suggested selling crystal methamphetamine. The CI also inquired about Mr. Garcia's access to firearms; Mr. Garcia indicated that his brother's friend had a "whole house full of em."[2] Mr. Garcia also informed the CI that he knew a member of a different gang who had "like six guns" and that Mr. Garcia had seen the guns the night before.[3] At no time did Mr. Garcia inform the CI that he was no longer involved in illegal activities or that he could not (or would not) assist the CI in procuring narcotics and weapons.

The CI and Mr. Garcia met two days later so that the CI could purchase methamphetamine to sell to his fictitious buyer. During the meeting Mr. Garcia indicated that the drugs were of very high quality ("This is fire") and advised the CI that the methamphetamine should not touch his skin

---

[2] R.155 at 7.

[3] *Id.* at 8.

or he would get high.[4] Mr. Garcia also told the CI that he could sell this methamphetamine for more than the typical street value of $900 per ounce because of its quality.

The CI texted Mr. Garcia again on November 24, 2014, and they agreed to meet later that day. At that time Mr. Garcia sold the CI 56.3 grams of pure methamphetamine for $1800. Mr. Garcia again warned the CI to double bag the drugs so that the CI did not "get sick."[5] During the course of this meeting, Mr. Garcia also informed the CI that he knew a father and son with "all kind of guns."[6] Mr. Garcia proposed going to their home, tying them up, and taking the guns. He assured the CI that "we ain't gotta kill em."[7]

The CI and Mr. Garcia met again on December 15, 2014. The CI purchased 55.6 grams of methamphetamine for $1800. When the CI inquired about weapons, Mr. Garcia responded that his sister's boyfriend was a possible source. Mr. Garcia followed up with the CI over the next few days regarding firearms availability.

On December 31, 2014, the CI texted Mr. Garcia for updates on the firearms. Mr. Garcia responded that he was waiting to hear from two possible suppliers. In January, Mr. Garcia got back in touch with the CI and notified him that he had located one and possibly two firearms. Two days later, on January 23, 2015, Mr. Garcia sold the CI a Taurus .38 caliber

---

[4] *Id.* at 26.

[5] *Id.* at 30.

[6] *Id.* at 31.

[7] *Id.* at 38.

revolver with a speed loader for $400; Mr. Garcia also sold the CI another 57.4 grams of methamphetamine for $1800.

Finally, the CI contacted Mr. Garcia on March 4, 2015, and requested another ounce of methamphetamine. Later that day, Mr. Garcia sold 27.9 grams of methamphetamine to the CI for $900.

## B. District Court Proceedings

On March 24, 2016, a grand jury indicted Mr. Garcia on three counts of distributing fifty or more grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). On November 20, 2017, a grand jury returned a superseding indictment which added two counts of distributing five or more grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

Prior to trial, the Government moved in limine to prevent Mr. Garcia from calling the CI as a witness. Mr. Garcia argued, however, that the CI's testimony was central to the presentation of an entrapment defense. Mr. Garcia later supplemented his response with a proffer of evidence setting forth the anticipated testimony of the CI that would support the defense. According to Mr. Garcia, the CI's testimony would establish that he and the CI were longtime family friends and that the CI had helped him obtain legitimate employment after he was released from prison in 2012. According to Mr. Garcia, the CI also would testify that he had invoked their mutual friendship as a basis to convince Mr. Garcia to engage repeatedly in illegal activities.

The district court concluded that Mr. Garcia had presented sufficient evidence of entrapment to raise the defense

at trial. It explained that "an entrapment instruction is warranted if the defendant proffers 'some evidence' that the government induced him to commit the crime and he was not predisposed to commit it."[8] The court determined that the evidence of a "close relationship," along with the CI's statements that he needed Mr. Garcia's help in obtaining drugs to sell, satisfied Mr. Garcia's "'low-burden' of presenting 'some evidence' that the Government induced" the criminal activity.[9] "Turning to predisposition," the district court noted that Mr. Garcia had "not presented substantial evidence regarding a lack of predisposition to sell drugs and firearms."[10] Nevertheless, his affidavit indicated that, after he was released from prison, he had "found honest work and was trying to stay out of trouble."[11] The court concluded that this evidence, and the fact that more than two decades had passed since Mr. Garcia had engaged in similar criminal conduct, arguably established a lack of predisposition. The court noted, however, that its ruling was limited to whether Mr. Garcia could present his defense at trial. The court "expresse[d] no opinion on whether Defendant ultimately w[ould] be successful with an entrapment defense."[12] Rather, at trial, the court would have to examine all of the evidence, determine what inferences could be

---

[8] R.74 at 3 (quoting United States v. Mayfield, 771 F.3d 417, 440 (7th Cir. 2014) (en banc)).

[9] *Id.* at 7.

[10] *Id.*

[11] *Id.* at 8.

[12] *Id.* at 9.

drawn from that evidence, and make any "credibility deter-minations necessary to reach a determination on the ultimate merits of Defendant's entrapment defense."[13]

By consent of the parties, a bench trial was held on March 5 and 6, 2019. After the presentation of evidence, the parties submitted argument on the issue of entrapment. Mr. Garcia maintained that the Government had not proved beyond a reasonable doubt that he had not been entrapped. He con-tended that the evidence established that he had an "im-portant, reciprocal" relationship with the CI.[14] He again high-lighted that when he was released from prison in 2012, the CI had helped him get a job as a truck driver. Moreover, he had come to the CI's aid in 2014 when he intervened to prevent a higher-ranking member of the Latin Kings from seeking re-venge against the CI. He also maintained that the only reason he had engaged in the crimes at issue was that the CI had made repeated pleas for assistance in obtaining drugs and guns.

Ultimately, the district court was not persuaded by these arguments. In a written opinion issued on April 3, 2019, the court found Mr. Garcia guilty on each count. It also concluded that the Government had proved beyond a reasonable doubt that Mr. Garcia had not been entrapped. The court acknowl-edged that "exploitation of friendship can constitute im-proper inducement"; however, friendship alone was not

---

[13] *Id.*

[14] R.108 at 5.

sufficient to establish inducement to commit a crime.[15] More-over, absent from the record was evidence of the kind of close relationship that would make Mr. Garcia "vulnerable to the C[I]'s entreaties."[16] Although repeated requests tantamount to harassment might well be evidence of inducement, in this case the CI's "inquiries were not met with silence or reluc-tance; rather, Defendant proved to be ready, willing, and able to deal, and at market prices."[17]

The court further determined that, even if there had been some inducement by the Government, the Government had established beyond a reasonable doubt that Mr. Garcia was otherwise predisposed to committing the crimes at issue. The fact that Mr. Garcia had sought—and obtained—legitimate employment when he was released from prison in 2012 did "not negate the compelling evidence indicating that, by 2014, Defendant had returned to the drug trade in a big way and that he also had ample and ready connections with firearm suppliers as well."[18] Thus, the court concluded "that (1) the evidence presented at trial establishe[d] beyond a reasonable doubt that Defendant is guilty as charged on all six counts of the superseding indictment and (2) Defendant's entrapment defense [could not] be sustained."[19]

---

[15] R.121 at 26 (quoting *United States v. McGill*, 754 F.3d 452, 455 (7th Cir. 2016)).

[16] *Id.* at 27.

[17] *Id.* at 28.

[18] *Id.* at 29.

[19] *Id.* at 31.

Following the court's verdict, the probation office prepared a PSR. With respect to Mr. Garcia's criminal history, the PSR identified four prior Illinois convictions for serious felonies: a 1980 conviction for aggravated battery and attempted armed robbery; a 1982 conviction for attempted murder; a 1990 conviction for aggravated battery; and a 1993 conviction for aggravated battery with a firearm.

With respect to his offense level, the PSR grouped Mr. Garcia's distribution offenses separately from his firearm offense. The adjusted offense level for the distribution offenses was 34. Regarding the firearm offense, the PSR employed a base offense level of 24 because Mr. Garcia had committed the instant offense after sustaining two felony convictions for crimes of violence. After a two-level increase because the weapon had been stolen, the adjusted offense level was 26. Once the offense level for each group was determined, the PSR calculated the multiple count adjustment. Specifically, under U.S.S.G. § 3D1.4, one (1) unit was assigned to the distribution group, and half of one (½) unit was assigned to the firearm group; this number of units translated into an offense-level increase of one (1). Thus, Mr. Garcia's final offense level was 35 with a resulting Guidelines range of 292 to 365 months.

The PSR also concluded that, given Mr. Garcia's criminal history, he was subject to a fifteen-year mandatory minimum sentence under 18 U.S.C. § 924(e)(1) for his § 922(g)(1) conviction.

Mr. Garcia filed an objection to the PSR in which he maintained that he should be given a reduction for acceptance of responsibility. He did not object to any of the calculations in the PSR or to the application of the mandatory minimum. The district court overruled Mr. Garcia's objection and adopted

the calculations as set forth in the PSR. The district court then sentenced Mr. Garcia to 210 months' imprisonment, 82 months below the low end of the adopted Guidelines range, but more than the mandatory minimum.

Mr. Garcia timely appealed his conviction and sentence.

## II

### A. Entrapment

Mr. Garcia first contends that the district court erred in rejecting his entrapment defense. Our court recently conducted a comprehensive review of our case law on entrapment and clarified both the substantive components of the defense as well the burdens of production and proof for establishing entrapment. *See United States v. Mayfield*, 777 F.3d 417 (7th Cir. 2014) (en banc). We explained that "[e]ntrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." The defense consists of two elements, inducement and predisposition, which "are conceptually related but formally and temporally distinct." *Id.* Specifically,

> inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the

> crime if left to his own devices will do so in re-
> sponse to the government's efforts.

*Id.* at 434–35. Examples of conduct that can have this effect are "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, [and] pleas based on need, sympathy, or friendship." *Id.* at 435.

Turning to the second element, we explained that "[p]re-disposition … refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 436. "[A] predisposed person is one who 'is presently ready and willing to commit the crime.'" *Id.* (quoting *United States v. Burkley*, 591 F.2d 903, 916 (D.C. Cir. 1978)). "The defendant's predisposition," we continued,

> is measured at the time the government first
> proposed the crime, but the nature and degree
> of the government's inducement and the de-
> fendant's responses to it are relevant to the de-
> termination of predisposition. A prior convic-
> tion for a similar offense is relevant but not con-
> clusive evidence of predisposition; a defendant
> with a criminal record can be entrapped.

*Id.* at 438.

*Mayfield* also set forth how the entrapment defense must be presented at trial. The defendant must come forward with "some evidence" supporting the defense. If the defendant meets this burden of production, the burden then shifts to the Government to "prove beyond a reasonable doubt that the

defendant was predisposed to commit the charged crime, or alternatively (but less commonly), that there was no government inducement." *Id.*

Our standard of review is dictated by the stage of the proceedings at which the entrapment defense is decided. If a district court determines before trial that a defendant should not be allowed to present an entrapment defense, our review is de novo. *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012). However, if the issue is submitted to the trier of fact and resolved against the defendant, then we evaluate whether, when viewed in the light most favorable to the Government, the record evidence is "sufficient … to permit a jury to determine beyond a reasonable doubt that the defendant was not entrapped." *United States v. Barta*, 776 F.3d 931, 936–37 (7th Cir. 2015) (quoting *United States v. Theodosopoulos*, 48 F.3d 1438, 1445 (7th Cir. 1995)).

Here, the district court, as trier of fact, determined that the Government had met its burden. We therefore apply the more deferential standard of review. *Cf. United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020).[20]

**1.**

Mr. Garcia claims that the Government failed to show lack of inducement and also did not meet its burden of proving

---

[20] In *United States v. Medina*, 969 F.3d 819 (7th Cir. 2020), we explained that "[w]e review challenges to the sufficiency of the evidence in a bench trial under the same deferential standard that applies to a jury verdict: we reverse 'only if we conclude, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* at 821 (quoting *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012)).

that he was otherwise predisposed to commit the crimes for which he was convicted. Mr. Garcia maintains that the CI took advantage of their friendship and wore down his will with repeated requests to buy illegal drugs. He supports his argument by inviting our attention to his first recorded conversation with the CI, during which Mr. Garcia "referenced family, mutual friends, and shared experiences."[21] Mr. Garcia also notes that, in this same meeting, the CI mentions several times that he is interested in obtaining drugs. However, even when considered together, these actions do not constitute Government inducement.

The evidence at trial established that Mr. Garcia and the CI were acquaintances and belonged to the same gang, but nothing more. There was no evidence that the two were close friends or were often in each other's company, apart from the illegal transactions.

In any event, friendship alone is not enough to establish inducement. *See United States v. Young*, 78 F.3d 758, 761–62 (1st Cir. 1996) (collecting cases); *see also United States v. Reyes*, 239 F.3d 722, 741 (5th Cir. 2001) (noting that "we nor any other court has held that inducement-through-friendship, standing alone, is sufficient to find entrapment as a matter of law"). Rather, it is "Government exploitation of friendship [that] can constitute improper inducement." *United States v. McGill*, 754 F.3d 452, 459 (7th Cir. 2014) (collecting cases).

Here, neither the recordings nor any of the other evidence at trial shows an effort by the CI to exploit an existing friendship. At no time did the CI invoke their friendship, familial

---

[21] Appellant's Br. 18.

ties, or shared experiences when asking about the availability of drugs or weapons. Moreover, the CI did not even hint that Mr. Garcia should feel obliged by such connections to assist the CI. Thus, we have "both a weak tool for improper importuning and no evidence that that weak tool was even employed." *United States v. Díaz-Maldonado*, 727 F.3d 130, 138 (1st Cir. 2013).

Regarding the repeated requests to engage in drug transactions, the evidence does not establish that the CI's requests wore down Mr. Garcia's resistance. As Mr. Garcia readily acknowledges, the repeated requests all came in his initial meeting with the CI. This is not a situation where constant haranguing led the defendant eventually to relent and join in the proposed criminal activity. *See, e.g.*, *Mayfield*, 771 F.3d at 424 (holding that a jury could find that an informant's daily efforts, over a period of two months, to persuade the defendant to join the conspiracy "amounted to harassment"); *United States v. Grajales*, 450 F. App'x 893, 899 (11th Cir. 2012) (holding that the defendant was entitled to an entrapment instruction when the "CI constantly called him and showed up at his house soliciting his participation in various home invasion robberies, which he repeatedly declined"). Indeed, at no time did Mr. Garcia refuse the CI's requests. During the initial conversation, Mr. Garcia did not respond to the CI's requests by saying that he was not involved in the drug trade or that he was unwilling (or unable) to assist the CI in his quest to acquire drugs. To the contrary, Mr. Garcia showed a familiarity with the availability and pricing of street drugs and even suggested to the CI that he purchase methamphetamine.

In short, the record amply supports the district court's finding that neither bonds of friendship, nor undue pressure

by the CI, induced Mr. Garcia to engage in the offenses at is-
sue.

**2.**

This same evidence also supports the district court's con-
clusion that, beyond a reasonable doubt, Mr. Garcia was pre-
disposed to engage in the drug transactions. As we have
noted, predisposition "refers to the likelihood that the defend-
ant would have committed the crime without the govern-
ment's intervention." *Mayfield*, 771 F.3d at 436. We tradition-
ally have employed a number of factors to inform this inquiry:

> (1) the defendant's character or reputation; (2)
> whether the government initially suggested the
> criminal activity; (3) whether the defendant en-
> gaged in the criminal activity for profit; (4)
> whether the defendant evidenced a reluctance
> to commit the offense that was overcome by
> government persuasion; and (5) the nature of
> the inducement or persuasion by the govern-
> ment.

*United States v. Stallworth*, 656 F.3d 721, 725–26 (7th Cir. 2011)
(quoting *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010)).
Of these, "the most important factor is whether the defendant
was reluctant to commit the offense." *Id.* at 726 (quoting *Hall*,
608 F.3d at 343).

Mr. Garcia maintains that he demonstrated reluctance "by
his repeated discussion of others who might be able to pro-
vide [the CI] with the requested controlled substances and
guns."[22] However, the record does not reveal any *refusals* to

---

[22] Appellant's Br. 19.

engage in criminal activity by Mr. Garcia that might show re-luctance. *See, e.g.*, *Mayfield*, 771 F.3d at 442 ("Mayfield repeat-edly rejected Potts's entreaties over the course of several weeks, relenting only when faced with an implied threat that the Gangster Disciples street gang might retaliate against him if he did not repay his debt. Accepted as true, Mayfield's ini-tial reluctance and continued resistance is substantive evi-dence that he was not predisposed to commit the crime when Potts first proposed it.").

Additionally, Mr. Garcia's "repeated discussion of others" who could assist the CI, when viewed in the light most favor-able to the Government, leads to a different conclusion: Mr. Garcia was familiar with, and had the means to procure, the drugs and guns that the CI sought. Far from reluctance, Mr. Garcia's recorded statements reveal both an effort to im-press the CI with his knowledge of the drug trade and a will-ingness to engage in that trade.

The remaining factors also support the district court's finding of predisposition. Although the CI first raised the pos-sibility of purchasing drugs and weapons, Mr. Garcia took it from there, conversing freely and in-depth on the types of drugs available, their quality, and their price. *See, e.g.*, *United States v. Johnson*, 32 F.3d 304, 308 (7th Cir. 1994) (rejecting en-trapment defense where defendant evidenced knowledge of drug terminology and pricing); *United States v. Holmes*, 421 F.3d 683, 687 (8th Cir. 2005) (stating predisposition had been shown through the defendant's "working knowledge of terms used in the drug trade" and discussions with the in-formant regarding "her dealings with other customers … and her ability to secure certain quantities of crack"). Mr. Garcia's own statements reveal that he was involved in the sale of

narcotics for a profit; indeed, he pocketed thousands of dollars just from the CI alone. *See Hall*, 608 F.3d at 343 (noting defendant's willingness "to participate in the criminal enterprise for a profit" as evidence of predisposition). In sum, we agree with the district court that the record was "replete with evidence of Defendant's predisposition."[23] Certainly, looking at the evidence in the Government's favor, it met its burden of showing predisposition beyond a reasonable doubt.

Because viewed in the light most favorable to the Government the evidence established beyond a reasonable doubt that Mr. Garcia was not induced to commit the crime and was otherwise predisposed to sell the drugs and weapon to the CI, there is no basis on which to disturb the district court's entrapment decision.

## B. Armed Career Criminal Act

Mr. Garcia also maintains that the district court erred in concluding that he was subject to a fifteen-year minimum sentence under 18 U.S.C. § 924(e)(1).[24] Mr. Garcia failed to raise

---

[23] R.121 at 31.

[24] 18 U.S.C. § 924(e)(1) provides:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

this argument before the district court, and, therefore, we review only for plain error. *See, e.g.*, *United States v. Hammond*, 996 F.3d 374, 400 (7th Cir. 2021).

To be subject to the mandatory minimum sentence set forth in 18 U.S.C. § 924(e)(1), a defendant must have been found guilty of at least three violent felonies or serious drug offenses. A violent felony is one that "has as an element the use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i). To determine whether a conviction meets this definition, courts apply the "categorical approach," which looks to the elements of the offense in the statute, not the underlying conduct. *Mathis v. United States*, 579 U.S. 500, 503–04 (2016).

At oral argument, Mr. Garcia's counsel conceded that, as defined by the Illinois statute in effect in 1992 when Mr. Garcia was charged, aggravated battery with a firearm is categorically a violent felony. At that time, the statute read: "Any person who, in committing a battery, knowingly causes any injury to another by means of the discharging of a firearm, commits aggravated battery with a firearm." Ill. Rev. Stat. 1991, Ch. 38, ¶12-4.2. The statute requires that the injury be caused "knowingly" and therefore contains the state of mind necessary for a violent felony. *See Borden v. United States*, 141 S. Ct. 1817, 1825–26 (2021). Moreover, there is no question that discharging a firearm during the commission of a battery constitutes "the use, attempted use, or threatened use of force against the person of another." *Cf. United States v. Curtis*, 645 F.3d 937, 940–41 (7th Cir. 2011) (holding that an Illinois statute that prohibits the discharge of a firearm in the direction of a person or vehicle when the shooter "knows or

reasonably should know to be occupied by a person" is a violent felony (quoting 720 Ill. Comp. Stat. 5/24–1.2(a)(2))).

Mr. Garcia nevertheless maintains that the district court should not have relied upon this conviction because the evidentiary basis for it is infirm. He does not dispute that he was convicted of aggravated battery with a firearm under the statute in effect in 1992. Instead, he claims that the conviction is suspect because the PSR did not include the statutory citation for the (indisputably) applicable provision of Illinois law.

However, our review here is for plain error only. The certified record of conviction, which was appended to the PSR, establishes that, on September 21, 1992, Mr. Garcia was charged with aggravated battery with a firearm and later pleaded guilty to that offense. Mr. Garcia has not come forward with any evidence to suggest that the statute of conviction was something other than Illinois Revised Statute Chapter 38, paragraph 12-4.2. Nor has he suggested any other grounds for concluding that his conviction does not constitute a crime of violence. "On plain error review, the burden of demonstrating both error and prejudice is on the defendant." *United States v. Ramirez*, 606 F.3d 396, 398 (7th Cir. 2010). Mr. Garcia has done neither.

Because Mr. Garcia has convictions for three qualifying felonies, the district court did not err in determining that he was subject to the fifteen-year mandatory minimum.

**C. Offense-level Calculation**

For the first time on appeal, Mr. Garcia maintains that the district court erred in calculating the offense level that served as a basis for his Guidelines range. Because he failed to raise this issue in the district court, our review is for plain error.

*See, e.g., United States v. Jerry*, 996 F.3d 495, 497 (7th Cir. 2021).
"To obtain relief under this standard, a defendant must prove
'(1) an error or defect (2) that is clear and obvious (3) affecting
the defendant's substantial rights (4) and seriously impugn-
ing the fairness, integrity, or public reputation of judicial pro-
ceedings.'" *Id.* (quoting *United States v. Williams*, 949 F.3d
1056, 1066 (7th Cir. 2020)). A Guidelines-calculation error fre-
quently will satisfy the plain error standard "because this 'er-
ror itself can, and most often will, be sufficient to show a rea-
sonable probability of a different outcome absent the error.'"
*Id.* at 498 (quoting *Molina-Martinez v. United States*, 578 U.S.
189, 198 (2016)). Additionally, "[w]ithout some indication to
the contrary, an incorrect Guideline calculation resulting in a
higher sentence will 'seriously affect the fairness, integrity, or
public reputation of judicial proceedings, and thus will war-
rant relief.'" *Id.* (quoting *Rosales-Mireles v. United States*, 138 S.
Ct. 1897, 1903 (2018)).

Here, the Government acknowledges that the PSR miscal-
culated the offense level for Mr. Garcia's firearm offense and
that this miscalculation ultimately affected Mr. Garcia's
Guidelines range.[25] We agree.

The PSR, which was adopted by the district court, em-
ployed a base offense level of 24 for Mr. Garcia's firearm of-
fense because he committed "the instant offense subsequent
to sustaining at least two felony convictions of either a crime
of violence or a controlled substance offense." U.S.S.G.
§ 2K2.1(a)(2). However, Application Note 10 to § 2K2.1 limits
the prior felonies that a court may consider for purposes of
determining the base offense level to those prior felonies that

---

[25] *See* Appellee's Br. 28.

receive criminal history points. Because of their age, most of Mr. Garcia's prior convictions for crimes of violence did not receive criminal history points.[26] The sole exception was his 1993 aggravated battery with a firearm conviction. Thus, Mr. Garcia's base offense level for the firearm conviction should have been 20, not 24. *See* U.S.S.G. § 2K2.1(a)(4)(A) (designating an offense level of 20 "if—(A) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense"). After imposing a two-level increase because the firearm was stolen, Mr. Garcia's total offense level for the firearm conviction should have been 22 but, instead, was 26.

This miscalculation affected Mr. Garcia's total offense level and resulting Guidelines range through the application of the grouping rules. Once the offense level for the distribution offenses (34) and the firearm offense (26) had been determined, the PSR applied the grouping rules set forth in U.S.S.G. § 3D1.4. Specifically, the PSR assigned one (1) unit to the distribution-offenses group, because that was the group with the highest offense level. It then assigned half of one unit

---

[26] Sentencing Guideline § 4A1.2(e)(1) provides that "[a]ny prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted." Also counted are "any prior sentence[s] of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id.* § 4A1.2(a)(3). However, "[a]ny sentence not within the time periods specified above is not counted." With the exception of the sentence for Mr. Garcia's 1993 aggravated battery with a firearm conviction, all of his other sentences fall outside the parameters set forth in § 4A1.2(e)(1).

(½) to the firearm-offense group, as directed by U.S.S.G. § 3D1.4(b), because the firearm-offense group level was between 5 and 8 group levels less serious than that of the highest group (the distribution offenses). This number of units, 1½, corresponded to an increased offense level of one. Consequently, Mr. Garcia's final offense level was 35.

If, however, Mr. Garcia's firearm-offense level had been properly calculated, he would not have been assigned any additional units for the firearm group. Properly calculated, Mr. Garcia's firearm-offense level would have been 22, and there would have been 12 offense levels separating his firearm offense and his distribution offenses. Guideline § 3D1.4(c) instructs courts to "[d]isregard any Group that is 9 or more levels less serious than the Group with the highest offense level." After application of the grouping rules, Mr. Garcia would have had only 1 group unit, not 1½, which corresponds to no increase in offense level. Thus, Mr. Garcia's offense level would have remained at 34.

Moreover, the difference in offense levels resulted in a difference in Guidelines ranges. Had Mr. Garcia's offense level been correctly calculated to be 34, the resulting Guidelines range would have been 262 to 327 months. However, the PSR (and the district court) concluded that Mr. Garcia's final offense level was 35, corresponding to a Guidelines range of 292 to 365 months. Thus, the district court's error resulted in an increased Guidelines range. As there is no evidence in the record that the district court would have imposed the same sentence if it had known that the Guidelines range was lower, a remand for resentencing is appropriate.

**Conclusion**

Mr. Garcia was not entrapped, and therefore we affirm his conviction. Additionally, the district court did not err plainly in concluding that Mr. Garcia was subject to the fifteen-year mandatory minimum sentence set forth in 18 U.S.C. § 924(e)(1). However, the district court plainly erred in the calculation of Mr. Garcia's firearm offense level. We therefore vacate his sentence and remand for resentencing based on a corrected offense-level calculation.

AFFIRMED in part; VACATED AND REMANDED in part