In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 21-1482 & 21-1672

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH D. JONES and EDWARD SCHIMENTI,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cr-236 — **Andrea R. Wood**, *Judge.*

ARGUED NOVEMBER 1, 2022 — DECIDED AUGUST 18, 2023

Before ROVNER, BRENNAN, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* A jury convicted Joseph Jones and
Edward Schimenti of providing material support to the ter-
rorist organization ISIS. In returning guilty verdicts, the jury
rejected an entrapment defense advanced by Jones. The dis-
trict court, in denying a post-trial motion for acquittal, like-
wise rejected his contention that the evidence showed that the
government overstepped and induced his commission of the

offense. Because the district court properly instructed the jury on the elements of entrapment, we owe the jury's ultimate determination meaningful deference and in the end agree with the district court's denial of Jones's motion for acquittal.

We likewise agree with the district court's denial of Jones and Schimenti's motion for a new trial based on a revelation that emerged after trial regarding a substantial payment the government made to a confidential source shortly after the jury convicted both defendants. What happened raises many questions, but, like the district court, we cannot conclude an earlier disclosure of a planned or contemplated post-trial payment would have resulted in the jury acquitting Jones or Schimenti. All of this leads us to affirm.

## I

## A

The trial evidence supplies the operative facts, which we set forth (as we must) in the light most favorable to the government. See *United States v. Leal*, 72 F.4th 262, 267 (7th Cir. 2023).

Joseph Jones and Ed Schimenti are childhood friends who lived near Chicago. Both men are practicing Muslims and members of the same mosque. In early 2015 the FBI began surveilling Jones and Schimenti based on their pro-ISIS social media posts that praised the organization, threatened nonbelievers of Islam, and glorified violent recruitment videos. Jones interacted on Google Plus with videos depicting violent beheadings and fatal stabbings. On his personal page, he wrote the "Islamic State wants a world ruled by the law of Allah. … Jihad for the kufar [non-believers] with blind corrupt hearts." Schimenti, too, posted on Google Plus to convey

his desire for Islamic rule, writing, "May Allah reward this fierce mujahideen [jihad fighter] who uses his life, body, and earthly might to make Allah's law govern all. May Allah reward him for striking fear in the hearts of the taghut [non-believers]."

After several months of physical and online surveillance, the FBI found no evidence of criminal activity but remained concerned about the pro-ISIS content in Jones's and Schimenti's ongoing posts. So in September 2015, the Bureau launched a full-scale investigation using undercover agents and a confidential human source.

The FBI began by initiating contact between Jones and an undercover agent going by the name "Omar." The contact arose in staged circumstances. The Bureau instructed local law enforcement to bring Jones to a police station under the guise of asking him questions about the recent death of his friend. Omar then initiated conversation with Jones in the station's waiting room by expressing his frustration at being profiled because he was a Black Muslim, an identity Jones shared. The FBI instructed Omar neither to discuss ISIS nor to ask for Jones's contact information, but only to open the door to a conversation to "identify [Jones's] true intent and understand what [he] truly want[s] to do." After discussing their shared identity, Jones asked Omar for his phone number and the two began a friendship.

B

Jones pursued a relationship with Omar and then with other undercover agents that unfolded over the next 18 months. Although the government kept in contact with Jones over that period using its multiple agents, it was Jones—and

not the agents—who drove the relationship forward. Following the meeting at the police station in September 2015, Jones and Omar continued to communicate by text message. Their early conversations began with general discussions about Islam.

At Jones's initiation, the communications eventually turned to radical Islam. He shared ISIS propaganda videos with Omar, to which Omar responded by thanking him and asking if he had more. After establishing their mutual support for ISIS—and repeatedly referring to Omar as his "brother"—Jones continued sending videos, including the violent ISIS recruitment video "Flames of War," which he had previously watched with Ed Schimenti in 2014. Seeing an opportunity to get more information about Jones's intent to commit a material support offense, Omar asked Jones whether he ever thought about traveling to Syria. Jones texted back: "Every night and day."

As their relationship progressed, Jones asked Omar whether he knew other "brothers" that he could "learn and build with"—a request to meet other ISIS supporters. Omar responded by introducing Jones to "Bilal," another undercover FBI agent posing as an ISIS travel facilitator. Omar indicated that Bilal could help people travel to Syria, something Omar said he planned to do. Bilal told Jones that he could help fund Jones's trip to Syria to support ISIS, but Jones never took him up on that offer.

Jones continued his friendships with the undercover agents, and on October 30, 2015, Omar and Bilal met Jones in person at a restaurant in Waukegan. Jones invited his close friend Schimenti to join them, and the four shared a meal.

Communications continued and two months later Omar, Bilal, Jones, and Schimenti met again in a hotel room in Gurnee, near Chicago. During that meeting Bilal showed Jones and Schimenti a video of Omar completing firearms training in a desert. Bilal then offered to help Jones and Schimenti perform a violent act, ostensibly on behalf of ISIS, telling them: "If you want to rock out right now, we gonna rock out right now." Neither of them accepted the offer, but Jones expressed his interest in the training video and recognized that Omar was actively preparing to become an ISIS fighter.

At that same December 2015 hotel meeting, Bilal put a question to Jones and Schimenti: "When we say who you with, you guys are on the same page right?" The two responded "alhumdulillah," meaning "all praises to Allah"—an enthusiastically strong "yes" indicating their support of ISIS's mission. But the meeting soured when Bilal followed up by asking Jones and Schimenti whether they had pledged "bay'ah," or allegiance to ISIS. Schimenti was upset by the question and left the room without responding, prompting Jones to explain that Schimenti worried that Bilal and Omar were federal agents. For his part, Jones did not answer Omar's question about swearing loyalty to ISIS, but more generally told Omar and Bilal that he wanted to keep in touch.

While Schimenti discontinued his relationship with Omar and Bilal following this meeting at the hotel, Jones kept his word and stayed in touch. Indeed, Jones continued to initiate communications and exchange pro-ISIS messages with both Omar and Bilal. In February 2016 Omar told Jones that he planned with Bilal's help to travel to Syria, to which Jones responded, "Brother, I wish I was going with you." Omar asked

Jones whether he wanted an ISIS flag to show his support. Jones readily accepted the flag and displayed it within his home while also sharing photos of himself with the flag on social media. After Omar departed, Jones contacted Bilal to ask for updates and pictures of Omar in Syria. He thanked Bilal for his help, writing, "May Allah reward you also."

During this time Jones additionally continued to seek and build ISIS connections on his own, independent of Omar and Bilal. In August 2016 Jones met a person on a pro-ISIS website also using the name "Omar." Unbeknownst to Jones, this second Omar, who we will call Omar 2, was an undercover FBI agent. During their online chat, Jones told Omar 2 that there was a "ferry getting brothers to the land of truth near us" and that "[s]ome brothers made hijra in May," referring to Bilal's facilitation of Omar's travel. In response to Omar 2's interest in traveling to Syria, Jones then took the step of introducing him to Bilal. When Bilal asked Jones for more information about Omar 2, Jones assured Bilal that Omar 2 was a "trustworthy brother" who "understands the religion the way we do." Jones eventually organized an in-person meeting in Gurnee between himself, Bilal, and Omar 2, after which Omar 2 purportedly traveled to Syria with Bilal's help.

In the ensuing months Jones and Schimenti continued to publicly and privately express pro-ISIS sentiments, including to peers at their mosque, that concerned the FBI. Given Schimenti's distrust of Bilal and Omar, the FBI devised a plan to introduce yet another player into the mix to reestablish contact with Schimenti through a new, more trusted source. The Bureau did so by introducing a confidential informant named "Muhamed" to Schimenti. In November 2016 Muhamed, a

native of Iraq, started working at the same company as Schimenti, and he and Schimenti soon became friends.

A few weeks into their friendship, Muhamed told Schimenti that he had a brother who lived in Syria and fought for ISIS. To assess Schimenti's own interest in providing material support, Muhamed expressed his desire to one day join his brother in the ISIS army. Schimenti responded positively and offered to help Muhamed, and the two began lifting weights together at Schimenti's gym to prepare Muhamed for battle in ISIS ranks. Muhamed also told Schimenti that he could provide help by giving him cell phones, explaining that ISIS used cell phones to create improvised explosive devices, or IEDs, as weapons and, in some instances, as defense mechanisms to avoid drone strikes.

Early the next year, in February 2017, Schimenti introduced Muhamed to Jones. Schimenti described Jones as a "trusted brother" who had "helped two other brothers travel overseas," referring to Jones's connection with Bilal, the FBI agent posing as a travel facilitator, and Jones's role in sending Omar and Omar 2 to Syria. Muhamed responded to the introduction by reiterating not only his desire to travel to Syria, but also his need for cell phones, again offering an opportunity to provide material support to ISIS based on the demonstrated interest displayed by Jones and Schimenti.

Jones and Schimenti readily accepted that offer. In March 2017 Jones gave Muhamed three phones, and Schimenti gave him six. Jones later testified before the grand jury that at the time he gave the cell phones to Muhamed, he did so of his own "free will" with the "hope it kills many of them" or "eight people." When Muhamed offered to reimburse the cost of the phones, Jones declined, stating he was excited enough

to receive the "ajr," or heavenly reward in Islam, for his acts. As part of his support for Muhamed's travel, Jones introduced him to Bilal, like he had previously done with Omar 2, and the three worked together to coordinate his departure.

A month later, in April 2017, Jones, Schimenti, and Muhamed met one last time. After sharing a meal, Jones and Schimenti drove Muhamed to O'Hare airport, where they believed he would be traveling to Syria with the nine cell phones they had given him to use as makeshift bombs in his role as an ISIS fighter. Before saying goodbye, Schimenti asked Muhamed to send a video of him killing someone when he arrived in Syria.

The FBI arrested Jones and Schimenti five days later.

## C

A federal indictment followed, focusing on the provision of cell phones for use as IEDs by ISIS fighters and charging Jones and Schimenti with providing material support to a terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). The indictment also charged Schimenti with making materially false statements to the FBI during his post-arrest interview in violation of 18 U.S.C. § 1001(a)(2).

Jones and Schimenti moved before trial to introduce an entrapment defense against the terrorism charges, and the district court allowed the defense to proceed to the jury. At trial, then, it became the government's burden to show beyond a reasonable doubt that the elements of the defense were not met. See *United States v. Mayfield*, 771 F.3d 417, 439 (7th Cir. 2014) (en banc) (explaining that once the defense of entrapment is at issue, "established entrapment doctrine places the

burden squarely on the government to disprove the defense beyond a reasonable doubt").

Trial began in May 2019 and continued for almost three weeks. The jury heard testimony from 15 witnesses, including terrorism experts, the undercover agent Bilal, the confidential human source Muhamed, FBI Agent Cassandra Carnright (who coordinated Muhamed's role), a member of Jones and Schimenti's mosque, and both their family and friends. Jones also testified in his own defense to explain why he believed the government had entrapped him. The jury received more than 100 exhibits, which were primarily recorded conversations and text messages between the defendants and the government's confidential informant, Muhamed, and the undercover agents Omar and Bilal.

The judge instructed the jury on the elements of the charges and the entrapment defense. Two days later the jury returned a guilty verdict on all counts.

D

A few pieces of evidence came to light after trial regarding the FBI's payments to Muhamed, the confidential human source who befriended Schimenti and who Schimenti later introduced to Jones. At trial Muhamed had testified to receiving some reimbursements for living expenses. And he stated that he did not expect to receive any additional compensation for his work. But the government later disclosed that the FBI, within approximately one month of the trial concluding, paid Muhamed an extra $50,000—effectively a bonus—for his role in the case. Jones and Schimenti reacted with alarm and suspicion to learning this information in the immediate wake of trial. The district court reacted with similar surprise,

promptly ordering discovery and an evidentiary hearing to get to the bottom of what led to this post-trial payment.

The case agent, Cassandra Carnright, filed an affidavit and testified at the hearing, with Jones and Schimenti cross-examining her. The FBI later supplied additional records showing the breakdown of its living-expense payments to Muhamed that revealed some discrepancies with the government's previous disclosures about the payments.

Jones and Schimenti invoked Federal Rule of Criminal Procedure 29 and sought a judgment of acquittal on the basis that they were entrapped as a matter of law. In the alternative, they moved for a new trial under Federal Rule of Criminal Procedure 33 based on the newly discovered evidence related to the FBI's payments to Muhamed. They also argued that a new trial was warranted because the district court limited the cross examination of certain FBI witnesses.

The district court denied the motions and affirmed the convictions of both defendants. Sentencing then followed, with Jones receiving 144 months' imprisonment and Schimenti 162 months.

## II

Jones challenges the district court's denial of his Rule 29 motion for acquittal of his material support conviction under 18 U.S.C. § 2339B(a)(1). He contends that the government fell short of proving beyond a reasonable doubt that it did not entrap him. Schimenti does not challenge his conviction on this ground.

A

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *Mayfield*, 771 F.3d at 420. These two elements of the entrapment defense—predisposition and inducement—are "conceptually related but formally and temporally distinct." *Id*. To meet its burden of proving that the defendant was not entrapped, the government must establish beyond a reasonable doubt "*either* that the defendant was predisposed to commit the crime *or* that there was no government inducement." *Id.* at 440 (emphasis in original).

Inducement occurs when a government agent's conduct "creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's persuasion." *Id.* at 434. This element entails more than the government's mere solicitation, suggestion, or offer of an "ordinary" opportunity to commit the crime. *Id.* Rather, "inducement means government solicitation of the crime *plus* some other government conduct." *Id.* (emphasis in original). Such "plus" factors include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, [and] pleas based on need, sympathy, or friendship." *Id*. at 435. The presence or absence of any one factor is not conclusive. The proper inquiry requires consideration of all facts and circumstances, with the ultimate question being whether an "otherwise law-abiding person would take the bait." *Id.* at 434.

Predisposition "refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 436. This element stems directly from the principles animating the entrapment doctrine: "A legitimate sting takes an actual criminal off the streets" rather than "deflect[ing] law enforcement into the sterile channel of causing criminal activity and then prosecuting the same activity." *Id.* (citation omitted).

By its very nature the predisposition inquiry "is chiefly probabilistic, not psychological." *Id.* at 428. Several factors inform a defendant's likelihood of committing the charged offense:

- the defendant's character or reputation;

- whether the government initially suggested the criminal activity;

- whether the defendant engaged in the criminal activity for profit;

- the nature of the inducement or persuasion by the government; and

- whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion.

*United States v. Anderson*, 55 F.4th 545, 552 (7th Cir. 2022) (citing *Mayfield*, 771 F.3d at 435). A defendant's reluctance to commit the offense is the most important consideration. See *Mayfield*, 771 F.3d at 437. Notice the relationship of this factor to the element of inducement: "Reluctance can prompt further

efforts at government persuasion that can rise to the level of inducement." *Anderson*, 55 F.4th at 553.

Predisposition also has a temporal dimension. "The defendant's predisposition is measured at the time the government first proposed the crime." *Mayfield*, 771 F.3d at 438. But that limitation does not mean that evidence arising after a defendant meets a government agent cannot be considered. "Other evidence of the defendant's conduct after the initial contact by the government's agents," we have explained, "may be relevant to the determination of predisposition," particularly because law enforcement often has little evidence predating contact. *Id.* at 437. Given the relationship between predisposition and inducement, we have cautioned that such "evidence must be considered with care" because "the defendant's later actions may have been shaped by the government's conduct." *Id.* But where the government has proven that a defendant's "predisposition was independent and not the product of the attention that the Government had directed" toward him, post-contact evidence can support a conclusion that the defendant would have likely committed the crime on his own and was therefore predisposed. *Jacobson v. United States*, 503 U.S. 540, 550 (1992).

B

Entrapment was Jones's primary defense from the beginning. He raised it early in the case, and the district court agreed to instruct the jury on the elements of the defense at trial. Neither Jones nor Schimenti challenge any aspect of that instruction on appeal. The issue before us is whether the district court committed legal error in denying Jones's post-trial motion for acquittal under Rule 29.

In doing so, the district court emphasized the heavy burden Jones faced in overturning the jury's verdict. From there the district court took great care reviewing the trial evidence, determining that, while some evidence supported Jones's position, a reasonable jury could have found both that he was predisposed to support ISIS and not induced by the government to commit the material support offense. The court pointed to evidence on which the jury could have relied to find that Jones voluntarily—without undue pressure from the government—bought and gave the cell phones to Muhamed intending them to be used as IEDs to further ISIS's ongoing fighting in Syria. The district court therefore concluded that Jones had not been entrapped as a matter of law and denied his motion for acquittal.

C

Federal Rule of Criminal Procedure 29 requires a district court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." While we owe no deference to the district court's assessment of the trial evidence, we do owe deference to the jury's verdict. See *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022); *United States v. Garcia*, 37 F.4th 1294, 1302 (7th Cir. 2022).

Indeed, our review proceeds as it would in an appeal in which a criminal defendant challenges the sufficiency of the government's trial evidence. See *Leal*, 72 F.4th at 267. We must "evaluate whether, when viewed in the light most favorable to the Government, the record evidence is 'sufficient … to permit a jury to determine beyond a reasonable doubt that the defendant was not entrapped.'" *Garcia*, 37 F.4th at 1302 (alteration in original) (quoting *United States v. Barta*, 776 F.3d 931,

936–37 (7th Cir. 2015)). We will set aside Jones's conviction "only where the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt," a standard we have described as "nearly insurmountable." *Leal*, 72 F.4th at 267 (citations omitted).

Having taken our own fresh look at the trial evidence, we conclude that the district court was right to reject Jones's motion for acquittal.

1

We begin with inducement. Some evidence introduced at trial supports Jones's argument that he was induced—but it is not our role to reweigh the evidence. See *Garcia*, 37 F.4th at 1302. When viewed in the light most favorable to the government, we see a sufficient basis to support the jury's finding that the government agents did not induce Jones to provide material support to Muhamed on behalf of ISIS.

Start with the evidence of the FBI agents' interactions with Jones. Several of the government's witnesses testified to taking care to maintain a responsive, and not affirmative, stance in their interactions with Jones. Agent Carnright used the term "mirroring" in her testimony to describe this behavior. The approach, as the term mirroring implies, allowed Jones to shape and advance his relationships and next steps with the government agents—all to make it less likely that their interactions amounted to repeated persuasion or undue pressure. The jury's ability to see the recorded conversations and text messages further enabled them to determine whether the agents' accounts were, in fact, credible.

We can put the point in more concrete terms. A reasonable jury could have interpreted the dynamic between Omar and

Jones, for instance, as one where Omar followed Jones's lead and not the other way around. Omar let Jones bring up ISIS in their early text conversations, asking Jones for more violent videos only after Jones sent the first pro-ISIS link. Similarly, Omar introduced Jones to a new undercover agent, Bilal, only after Jones asked Omar if he could meet other "brothers" to "learn and build with"—a clear request to meet other ISIS sympathizers. Omar also offered to give Jones an ISIS flag in response to Jones's demonstrated interest in Omar's travel abroad, an offer Jones readily accepted.

Muhamed likewise testified that he followed the FBI's instruction not to directly ask Jones to do anything, but instead to more passively offer the opportunity to provide support if Jones seemed receptive. Indeed, the FBI did not even introduce Muhamed to Jones—Schimenti did. And Schimenti, as Jones's close friend, took this step because he knew that Muhamed wanted to travel to Syria and that Jones, through Bilal, would be willing and able to help him do so. That is exactly what Jones did, and a reasonable jury could have relied on this evidence to conclude Jones had a desire to materially support ISIS that arose untainted by the government's involvement.

The trial evidence also permitted a finding that Jones took many acts on his own, without undue influence or pressure from government agents. Consider foremost his testimony to the grand jury. Jones told the grand jury under oath that he gave Muhamed the cell phones of his own "free will" in hopes that "it kills many of them" or "eight people." In no way did he suggest during his grand jury testimony that he did so to submit to pressure exacted by Muhamed or anyone else. The trial evidence also showed that Jones, of his own volition,

contacted his former girlfriend with a request to supply the cell phones after receiving the initial invitation from Muhamed to procure them for ISIS. The jury had ample evidence showing that the government agents did not do anything other than offer Jones a chance to provide support to ISIS in response to Jones's own representations to that effect.

Jones urges a different analysis by focusing on the duration of the government's investigation, seeing it as an 18-month campaign designed to wear him down by persistently nudging him toward the commission of a crime. By Jones's account, the FBI was not willing to stop pressing him until he relented and took a step to provide material support to ISIS. He views the government's conduct as analogous to the entrapment the Supreme Court determined occurred in *Jacobson v. United States*, 503 U.S. 540 (1992). While Jones's counsel has advanced these arguments with great clarity and rigor, we see no infirmity in the jury's rejection of the entrapment defense.

Yes, the FBI pursued Jones and Schimenti for a meaningful length of time. But the length of the investigation does not, on its own, lead to the conclusion that no reasonable jury could have rejected Jones's entrapment defense. "[T]here is no per se rule regarding the number of contacts or length of relationship it takes to constitute inducement. Each case, and each entrapment defense, must be judged on its own facts." *Barta*, 776 F.3d at 937–38. This is why "entrapment is a question for the jury, not the court"—because the jury is best suited to make such findings of fact. *Mayfield*, 771 F.3d at 439.

The jury here could have found that the FBI's investigation took substantial time for good reason. Agent Carnright testified that the Bureau opened its investigation upon seeing clear indicators on social media sites that Jones and Schimenti

were avid ISIS sympathizers—with both defendants express-
ing approval of the violence the terrorist organization em-
ployed to advance its mission. The FBI reasonably wanted to
know more about Jones and Schimenti: Did their sympathies
with ISIS extend beyond a personal viewpoint and evince any
present intent or risk of them supporting the group, either by
providing resources or traveling to Syria to join the fight? The
only way to glean that answer was to take proactive steps to
discern Jones and Schimenti's intentions, hence the Bureau's
use of informants to befriend and communicate with both de-
fendants. The trial evidence showed—and a reasonable jury
could have found—that all of this occurred in steps that took
time, with the FBI taking sufficient care all along the way to
ensure their informants were acquiring information, not ag-
gressively pressing either defendant to commit a crime.

A more distinct disconnect warrants emphasis. Jones sees
the trial evidence as showing a campaign of persistent pres-
sure being imposed by the FBI to commit a crime. It is possible
to read aspects of the evidence that way. For example, Jones
repeatedly expressed his reluctance to travel to Syria himself,
and he declined to join Omar and Bilal in "rock[ing] it out" in
a violent attack on behalf of ISIS. And at trial Jones testified
that he supplied the cell phones because "there had been four
or five people that came into [his] life trying to get [him] to
provide some form of material support to ISIS," so that when
Muhamed finally asked him for cell phones in March 2017, he
delivered them because he believed "God has got to be put-
ting all these people in [his] life for a reason."

But it is equally possible to view the trial evidence another
way—that Jones voluntarily made his own choice to move be-
yond sympathy and agreement with ISIS to affirmatively

supporting the organization by supplying cell phones for use as IEDs in Syria, all despite some episodic pressure imposed by the FBI. And that evidentiary reality—of the trial evidence being amenable to different findings—is what precludes us from being persuaded that the government failed to prove that Jones was not induced to provide material support to ISIS.

Nor do we see *Jacobson* as lending much support to Jones. Though the government conceded inducement in *Jacobson*, the facts provide important instruction. Keith Jacobson received persistent mailings from six fake entities, almost all of which expressly encouraged him to engage in illegal conduct. When he finally accepted an offer to buy illicit child pornography two and a half years after the government started its campaign, he was arrested. See 503 U.S. at 543–47. The Supreme Court observed that Jacobson's predisposition to commit the crime was not independent from the government's inducement, and so concluded that he had been entrapped. See *id.* at 550.

The FBI's conduct here is much less intrusive than that in *Jacobson*, or at least the jury could have so concluded. The government provided sufficient evidence illustrating a patient and prolonged investigation. A jury could conclude that Jones made willing and voluntary decisions to accept the government's overtures, though they occurred over a long period of time. So we cannot conclude that Jones was induced as a matter of law.

### 2

That brings us to predisposition. Much like inducement, it is not enough for Jones to argue that his version of events is

possible. That is the central teaching of *Mayfield*. See 771 F.3d at 439 ("[T]he subjective basis of the defense makes entrapment a fact question for the jury to decide 'as part of its function of determining the guilt or innocence of the accused.'" (quoting *Sherman v. United States*, 356 U.S. 369, 377 (1958))). To be acquitted of his material support conviction, Jones must show no rational jury could have concluded that the government carried its burden. See *Leal*, 72 F.4th at 267. We cannot get there.

Return to the beginning—to Jones's pro-ISIS social media posts that led to the government's investigation in the first place. Jones regularly shared ISIS propaganda, including the violent Flames of War recruitment video. Jones and Schimenti watched this video together well before any contact by government informants. Jones also made comments praising ISIS, speculating about ISIS's plans to attack different cities, and expressing distrust of any nonbelievers in Islam. The jury did not have to reach far to view Jones's statements as supporting a finding that he was likely to take affirmative steps to support ISIS if given the opportunity.

Jones urges us to see his social media posts as speech protected by the First Amendment and thus beyond any consideration in a criminal prosecution. Not so. That the First Amendment allowed Jones to express agreement with ISIS's messaging, mission, and means of accomplishing its objectives does not mean the speech was off limits for what it reveals about his predisposition to commit crime. In *Jacobson*, the Supreme Court held that "[e]vidence of predisposition to do what once was lawful is not, *by itself*, sufficient to show predisposition to do what is now illegal." 503 U.S. at 551 (emphasis added). That observation explains why Keith

Jacobson's legal purchase of child pornography before Congress made the acquisition of such material a crime did not, alone, prove that he was predisposed to later buy it illegally. But we know of no authority—and Jones has identified none—supporting Jones's view that the First Amendment shields from consideration statements he made that shine substantial light on his intent and predisposition to commit the crime, especially given the other evidence giving import to that intent.

Indeed, evidence arising after Jones's initial government contact with Omar at the police station in September 2015 is consistent with Jones's views before that date, thereby further allowing a jury to find predisposition. As a legal matter, we have clarified that, while predisposition is measured at the time the government first offers the opportunity to commit the offense, "evidence of the defendant's conduct after the initial contact by the government's agents … may be relevant to the determination of predisposition" so long as that evidence is "considered with care" given the risk that "the defendant's later actions may have been shaped by the government's conduct." *Mayfield*, 771 F.3d at 437. The consistency we see in the evidence is important to that care we must take in our assessment. Jones's consistent statements and actions across time make the case for predisposition, untainted by government involvement, much stronger.

Consider the post-2015 evidence of Jones's character and reputation. At trial Jones chose to take the witness stand and testify in his own defense. He told the jury that he had thought about moving to Syria to live under the Islamic state before he met any government informants. In response to Omar's offer of the ISIS flag, Jones testified that he "willingly

took the ISIS flag," "was excited to have the flag," and shared photos of himself with it on social media because he wanted "other people to see [him] with the flag" as a show of support for ISIS. Jones's ex-girlfriend and a member of his mosque testified that he shared pro-ISIS materials with them separately from any interactions with Omar, Bilal, or Muhamed.

Evidence of Jones's motivations to commit the offense further show his pro-ISIS enthusiasm. No better example than the sworn, counseled testimony Jones conveyed to the grand jury. In no uncertain terms, he told the grand jurors that he gave Muhamed the cell phones of his own "free will" in hopes that "it kills many of them" or "eight people." Jones also declined reimbursement for the phones when Muhamed offered it because he was instead excited to receive the "ajr," or heavenly reward in Islam, for his acts. The jury reasonably could have viewed these statements as evidence of Jones's independent predisposition to commit the material offense.

Notice, too, that the trial evidence shows no meaningful reluctance by Jones to support ISIS. See *Garcia*, 37 F.4th at 1304 (explaining that prior reluctance to engage in the offense of conviction heavily informs the predisposition inquiry). To the contrary, Jones consistently demonstrated his independent interest in ISIS, including the violent means employed by the organization to advance its mission. Jones never cut off communication with Omar and Bilal or affirmatively disavowed support for ISIS. When Jones did decline to respond to Bilal's invitation to formally pledge allegiance to ISIS in December 2015, he nevertheless made plain his support of the organization's mission and told Omar and Bilal that he wanted to keep in touch. He followed through with that promise by

continuing to communicate with them despite Schimenti's (correct) instincts that they were government agents.

In no way did Jones's views of ISIS change at the end of 2015. He maintained an active social media presence, including by affirmatively seeking interactions with members of the ISIS community online. This is exactly how he found and befriended the undercover agent Omar 2. When Omar 2 expressed an interest in traveling to Syria, Jones not only connected him with Bilal, but vouched for him as a "trustworthy brother" that Bilal should help. And Bilal did facilitate Omar 2's travel, as far as Jones knew, after Jones arranged for them to meet in person and create a plan. Jones's later decision to connect Muhamed with Bilal, after supplying him with cell phones, further reinforces Jones's ongoing commitment to advancing ISIS's mission.

Considered collectively and viewed in the light most favorable to the government, the evidence before and during the investigation was sufficient for a jury to conclude that Jones was independently predisposed to provide material support to ISIS.

*      *      *

What makes a case like this challenging is that it is easy to see a jury going either way on entrapment. But that reality is precisely why the law empowers the jury to decide, placing the burden on the government to prove beyond a reasonable doubt that it did not entrap Jones. Our role on appeal is to ask whether any rational jury could have found that the government carried this burden. Like the district court, we believe the answer is yes: evidence in the record supports the jury's

conclusion that Jones was not entrapped, so his material-support conviction stands.

## III

Jones and Schimenti both appeal the district court's denial of their motion for a new trial under Rule 33 in light of the government's post-trial disclosures that, within three weeks of the trial concluding, the FBI paid Muhamed a $50,000 cash bonus for his assistance as a confidential informant.

### A

Here is what happened. At trial the government called Muhamed to testify about his interactions with Jones and Schimenti. He began with some personal background, explaining that he was born in Iraq and moved to the United States in 2014 after working five years for the United States Department of Defense in Iraq. Muhamed stated that his first contact with the FBI came in 2016, when agents interviewed him after learning that he displayed an ISIS flag on his car. That encounter led in time to Muhamed agreeing to assist the FBI's counterterrorism efforts by serving as an informant on national security matters.

Turning to the events that culminated in Jones's and Schimenti's arrests in April 2017, Muhamed testified that he pressured neither defendant to buy cell phones for use as IEDs by ISIS in Syria. To the contrary, Muhamed emphasized that he sought only to adhere to the FBI's direction to limit his interactions to what the Bureau calls "mirroring"—the practice of echoing messaging advanced in the first instance by Jones and Schimenti, avoiding any affirmative steering, and thereby allowing each defendant to make his own choices about any next steps in the relationship. By Muhamed's

account, this approach culminated in both defendants affirm-atively choosing to supply cell phones for use as IEDs.

On direct and cross examination, Muhamed acknowl-edged his potential biases, testifying that the FBI paid him liv-ing expenses for fuel, a cheap car, parking, and moving costs, with the Bureau also assisting him with his green card appli-cation. He insisted that he neither expected nor sought further compensation from the FBI for his cooperation, however. Agent Carnright offered consistent testimony and estimated these expense payments to Muhamed totaled $16,000.

What transpired after trial is what most concerns Jones and Schimenti. About one month after the jury returned guilty verdicts, the FBI paid Muhamed a $50,000 bonus. More than three months later, in October 2019, the government dis-closed this payment to Jones and Schimenti—a revelation that took them, and the district court, by surprise.

Recognizing the gravity of the government's post-trial dis-closure, the district court granted Jones and Schimenti's mo-tion for an evidentiary hearing and ordered discovery. Agent Carnright supplied an affidavit and testified at the hearing. She stated that the FBI had contemplated making a bonus payment before the arrests in 2017 but decided based upon a pretrial discussion she had with an Assistant United States Attorney to postpone any payment until after trial. Agent Carnright insisted that she shared none of this information, including the prospect of a future payment, with Muhamed.

Following the hearing, the FBI also supplied defense coun-sel new records showing a more detailed breakdown of the $16,000 in payments it made before trial to Muhamed. These itemized records revealed that the government's pretrial

disclosures were neither complete nor accurate. Recall that Agent Carnright testified at trial that the FBI paid Muhamed $16,000 to cover "any costs incurred to him throughout the course of the investigation." Muhamed testified similarly at trial, stating that the FBI reimbursed him "only for fuel, car—I mean, not fancy car, just cheap car—for parking, for moving out from my old apartment after the case." But the new report showed that the $16,000 stipend included, among other things, a $1,200 down payment on a car, three car payments of $400 each, a $925 security deposit, payments for three months of rent totaling $2,775, and nonspecific "per diem" expenses totaling $2,130. And perhaps most concerning to Jones and Schimenti, the FBI's post-trial report also showed $5,575 paid for what it called an "amount service"—an undefined description connoting some sort of bonus, as the Bureau used the same words to describe the $50,000 post-trial payment to Muhamed.

At no point has the government explained why it did not take more care before trial to ensure a complete and accurate disclosure of the financial support provided to Muhamed. The best explanation, though hardly acceptable, seems to be oversight and sloppiness.

B

Invoking Rule 33, Jones and Schimenti requested a new trial, arguing that the government's failure to fully and accurately disclose these actual and planned payments limited and impaired their defense efforts at trial. They contended the jury may have reached a different outcome had they known the government had already paid Muhamed one bonus of $5,575 and had plans to pay him another bonus ten times larger in the immediate wake of trial. Both defendants

believed they could have used this information to undermine Muhamed's and the government's credibility and thereby advance their entrapment defense by exposing everyone's true incentive of doing everything possible to coerce them into committing a material support offense.

The district court did not mince its words in describing its reaction to learning of these post-trial developments, making plain that it found "the Government's belated and at times contradictory disclosures regarding the FBI's payments to Muhamed troubling." In the end, however, the district court determined that any disclosure shortcomings did not rise to the level of meeting Rule 33's demanding standard for a new trial. What mattered most to the district court was the strength of the government's case against Jones and Schimenti. Seeing no likelihood of acquittal, the district court denied the motion for a new trial.

## C

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Our review is limited to assessing whether the district court's ruling reflected an abuse of discretion. See *Foy*, 50 F.4th at 622.

To receive a new trial based on newly discovered evidence, Jones and Schimenti must show "that the evidence 'came to their knowledge only after trial; could not have been discovered sooner had due diligence been exercised; is material and not merely impeaching or cumulative; and would probably lead to an acquittal in the event of a retrial.'" *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013) (quoting *United States v. Ryan*, 213 F.3d 347, 351 (7th Cir. 2000)).

Recognize at the outset, just as the district court did, that "the $50,000 payment itself does not constitute newly discovered evidence because it had not occurred at the time of trial." So we could not order a new trial based on the bonus payment alone. The primary hurdle for Jones and Schimenti, then, is showing that they likely would have been acquitted had they known about the potential for Muhamed's post-trial bonus and had they received a more complete and accurate accounting of the $16,000 living-expense payments. See *id.*

We have a difficult time seeing how a pretrial disclosure from the government that the FBI planned to pay Muhamed a $50,000 bonus after trial would have created a likelihood of a different outcome. Foremost, the district court found no evidence in the government's post-trial disclosures of "an express agreement between Muhamed and the FBI that he would be paid." Even more, the district court found "the most likely scenario to have been that Agent Carnright intentionally avoided any mention of a potential post-trial payment to Muhamed so that it would not have to be disclosed to defense counsel." Nothing Jones and Schimenti have presented on appeal calls these findings into question.

On this record, and in full alignment with the district court, we find it unlikely that any pretrial disclosure about a planned or contemplated payment of a $50,000 bonus to Muhamed would have changed the jury's ultimate guilt determinations.

The post-trial disclosure of the itemized expense report falls short for similar reasons. No doubt the evidence is impeaching, at least to some degree. But, as the district court observed, this was not a case hinging on credibility determinations, as much of the evidence presented to the jury consisted

of recorded conversations and statements Jones and Schimenti posted online. The single unrecorded conversation that Jones and Schimenti raise, where they contend that Muhamed appealed to Schimenti's emotions to encourage him to help Muhamed travel to Syria, is not enough on its own to show that acquittal would have been likely had the disclosures been made earlier. And Jones and Schimenti had a full and fair opportunity to, and did, cross-examine Muhamed about this conversation at trial.

To the extent Muhamed's credibility was at issue, we agree with the district court that the itemized report is cumulative. The government had already disclosed that Muhamed received $16,000 for his services, a total that is not called into question by the new report disclosed after trial. And the jury heard Agent Carnright's testimony that Muhamed received immigration assistance in exchange for his work, including substantial help with his green card application. In our view, it is unlikely that the new, more detailed evidence of the FBI's payments to Muhamed would have tipped the scales in favor of acquittal. The jury already considered substantial evidence tending to impeach Muhamed's motives in returning the guilty verdicts. We agree with the district court's denial of the Rule 33 motion.

## IV

One brief issue remains. Jones contends that the district court improperly entered a protective order restricting his cross-examination of government witnesses while also wrongly denying his Rule 33 motion challenging that decision. We see no abuse of discretion.

At trial the government moved for a protective order to prevent the disclosure of certain witnesses' true identities—all to protect the witnesses and their families and to preserve the integrity of the FBI's ongoing counterterrorism efforts. The district court entered the requested order, explaining that given the protected information's low probative value, the FBI's national security concerns justified the restriction.

The district court denied Jones's later Rule 33 motion challenging the protective order, explaining that the information was not material to Jones's case and that he was therefore not prejudiced by its exclusion. On appeal Jones insists that the suppressed information is material to his entrapment defense because the agent he wanted to question had expressed in an email that the lengthy investigation into Jones was like "beating a dead horse" given the many months that passed without evidence of a crime. Jones would have liked to cross-examine this witness to learn more about the witness's view of the investigation and any persuasive tactics the FBI may have used.

We review the decision for an abuse of discretion. See *Foy*, 50 F.4th at 622. The law affords district courts broad authority to impose reasonable limits on cross-examination to prevent "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The FBI sought to protect its witnesses and the integrity of its investigative processes in a widely publicized terrorism trial. Jones has failed to show that, contrary to the district court's finding, cross-examination would have yielded material evidence or that the evidence was otherwise unavailable to him from other witnesses. Indeed, a centerpiece of Jones's entrapment defense was that the FBI persisted in its investigation for

18 months and that he did not relent until it succeeded in pushing him into the commission of a crime. With that position already presented to the jury, we cannot conclude the district court's ruling had any impact on the trial's outcome.

For these reasons we AFFIRM.